UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-14360-CIV-MIDDLEBROOKS/JOHNSON

STUART CAY MARINA,

vs.

M/V *SPECIAL DELIVERY*, et al.

_____

## ORDER DENYING SUMMARY JUDGMENT

THIS CAUSE comes before the Court upon the Defendants' Motion for Summary Judgment (DE 330) and Plaintiff, Stuart Cay's, Cross Motion for Partial Summary Judgment (DE 338). The Court has reviewed the Motions and finds that they are due to be denied.

This is an action for damages allegedly caused by Defendants to Plaintiffs' Marinas during hurricane Frances (the "Storm") in the summer of 2004. Plaintiffs initially commenced this action against some seventeen individuals and their boats under theories of trespass (Count's I and II)[1] and general maritime negligence (Counts IV and V). The Plaintiffs have resolved their claims against all Defendants other than Phipps and the *M/V Special Delivery* (the "Vessel," or, alternatively, the "*Special Delivery*"). The Defendants' Motion addresses only those claims made by Plaintiff Stuart Cay. Defendants filed a Motion to file a Motion for Summary Judgement out of time against the second Plaintiff, Allied Marine which I denied as untimely.

In their Complaint,[2] Plaintiffs assert that Defendant Phipps negligently failed to move the

_____

[1] Count I is brought by Plaintiff Stuart Cay against Phipps and the *M/V Special Delivery*, Count II is brought by Plaintiff Allied Marine against Phipps and the *Special Delivery*.

[2] The Operative Complaint is the Amended Verified Complaint filed on February 23, 2005.

*Special Delivery* to its pre-planned safe harbor (the "Safe Harbor") inside the St. Lucie Canal

a/k/a Okeechobee Waterway, or to any alternative safe harbor in the North or South Fork of the

St. Lucie River, before the Storm made landfall.  Plaintiffs additionally contend that Phipps

failed to properly secure the Vessel at or near its position at the Stuart Harbor Marina before the

Storm's arrival.  They claim that such negligence caused the *Special Delivery* to allide[3] with their

docks.  Lastly, Plaintiff Stuart Cay asserts that Phipps and the Vessel are liable for trespass due to

their unauthorized use of Stuart Cay's dock facilities during Hurricane Frances and for five days

thereafter.[4]

At this point, discovery has concluded and the instant Motions have been filed.

Defendants and Plaintiff Stuart Cay each claiming that they are entitled to summary judgment.

Defendants claim they are so entitled, as to Stuart Cay's negligence claims, because those claims

are entirely premised on the Defendants' failure to move the *Special Delivery* prior to the Storm,

and as a matter of law, they had no duty to remove the Vessel from Stuart Harbor Marina.  They

also seek summary judgment on Stuart Cay's trespass claims asserting that a *prima facie* case of

maritime trespass requires proof that the alleged trespasser intentionally entered land in

possession of another, and that there is no evidence that the Defendants ever intentionally entered

upon Stuart Cay's property.

Stuart Cay seeks summary judgment on the issue of liability claiming that it is entitled to

judgment as a matter of law because:

---

[3]  An allision is defined in maritime law as '[t]he contact of a vessel with a stationary object such as . . . [a] pier." BLACK'S LAW DICT. 83 (8th ed. 2004).

[4]  Plaintiff Allied Marine withdrew its trespass claims against Phipps and the *Special Delivery*.  (*See* Joint Pre-trial Stipulation at 2).

(1)     Under long-standing admiralty law principles, there is a presumption that a

        drifting or moving vessel which strikes a stationary object is at fault;

(2)     This presumption shifts the burden to the Defendant to establish by a

        preponderance of the evidence that either:

        (a)     The allision was the fault of the stationary object; or

        (b)     The moving vessel acted with reasonable care and the allision was

                an "Act of God;" and

(3)     Defendants have not met there burden of establishing that they did everything

        possible to avoid the allision, or that it was an unavoidable "Act of God."

STANDARD OF REVIEW

      The standard to be applied in reviewing summary judgment motions is contained in Rule

56(c) of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.

> Summary judgment may be entered only where there is *no* genuine issue of material fact.

The moving party bears the burden of meeting this standard.  O*Adickes v. S.H. Kress & Co.,* 398

U.S. 144 (1970).  As the Eleventh Circuit has explained:

> In assessing whether the movant has met [its] burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion.  *Adickes,* 398 U.S. at 157; *Marsh,* 651 F.2d at 991.  All reasonable doubts about the facts should be resolved in favor of the non-movant. *Casey Enterprises v. Am. Hardware Mutual Ins. Co.,* 655 F.2d 598 (5th Cir. 1981).  If the record presents factual issues, the court must

3

not decide them; it must deny the motion and proceed to trial. *Marsh,* 651 F.2d at 991; *Lighting Fixture & Elec. Supply Co. v. Continental Ins. Co.,* 420 F.2d 1211 (5th Cir. 1969). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co.,* 420 F.2d at 1213. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *Impossible Electronics,* 669 F.2d at 1031; *Croley v. Matson Navigation Co.,* 434 F.2d 73 (5th Cir. 1970).

Moreover, the party opposing a motion for summary judgment need not respond to it with any affidavits or other evidence unless and until the movant has properly supported the motion with sufficient evidence. *Addickes,* 398 U.S. at 160 . . .; *Marsh,* 651 F.2d at 991. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg,* 370 F.2d 605, 611-12 (5th Cir. 1967). *See Dalke v. Upjohn Co.,* 555 F.2d 245, 2488-49 (9th Cir. 1977).

*Clemons v. Dougherty County,* 684 F.2d 1365, 1368-69 (11th Cir. 1982); *see also Amey, Inc. v. Gulf Abstract & Title, Inc.,* 758 F.2d 1486 (11th Cir. 1985), *cert. denied,* 475 U.S. 1107 (1986). The United States Supreme Court has provided significant additional guidance as to the evidentiary standard which district courts should apply when ruling on a motion for summary judgment:

[The summary judgment] standard mirrors the standard for a directed verdict under Federal Rules of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Brady v. Southern R. Co.,* 320 U.S. 476, 479-80 (1943).

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986). The Court in *Anderson* further acknowledged that "[t]he mere existence of a scintilla of evidence in support of the position will

4

be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 243.  If the non-movant in a summary judgment action fails to adduce evidence which would be sufficient, when viewed in a light most favorable to the non-movant, to support a jury finding in his favor, summary judgment may be granted.  *Id.* at 254-55.

In a companion case, the Supreme Court declared that a non-moving party's failure to prove an essential element of its claim renders all factual disputes as to that claim immaterial and requires the granting of summary judgment:

> In our view, the plain language of Rule 56© mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning  an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322-33 (1986).  We measure the motions for summary judgment against these standards.

Factual Background

The following facts are undisputed.  Prior to the Storm, Phipps and her husband, Eric Oster, ("Oster") lived aboard the *Special Delivery,* a ninety-seven foot aluminum crew boat, and moored the Vessel at the Stuart Harbor Marina ("Stuart Harbor") located approximately 1/4 of a mile to the south of Plaintiff, Stuart Cay, without incident.  Both Phipps and Oster held United States Coast Guard 100-ton captain licenses during the time period of approximately 1995 - 2000, and they used the Vessel to perform passenger charters for hire from approximately 1988

through 1997.  In August of 2004, prior to the Storm's arrival, Phipps had made arrangements to dock the Vessel at a property on the Okeechobee waterway in the event that evacuation from the Stuart Harbor became necessary (the "Safe Harbor Location").   Plaintiff, Allied Marine ("Allied"), is located in between Stuart Harbor and Plaintiff Stuart Cay.

At 11:00 a.m. on Thursday, September 2, 2004 ( the "Initial Warning"), the National Oceanic and Atmospheric Administration ("NOAA") issued a Hurricane Warning for the east coast of florida extending approximately 280 miles from Florida City in Southern Dade County northward to Flagler Beach in Flagler County, including the Stuart area where the Stuart Harbor, Allied, and Stuart Cay marinas are located.[5]  The warning was in effect until 5:00 p.m. on Sunday, September 5, 2004.  At the time of the Initial Warning, Frances was a Category 4 Hurricane with maximum sustained winds near 145 mph.  By 8:00 p.m. on Friday, September 3, Frances had weakened to a strong category 2 storm with maximum sustained winds of close to 105 mph with higher gusts.  Later advisories did not predict further weakening or strengthening. The Storm made landfall on the east coast of Florida late in the evening of Saturday, September 4 as a Category 2 hurricane.  Three weeks later Hurricane Jeanne, a slightly stronger Category 3 hurricane, a bit smaller than Frances and moving at a quicker pace, hit Florida taking virtually an identical path as Frances.

When the Storm was approaching, Phipps considered her alternatives and determined that

---

[5]  NOAA issues Huricane Warnings when sustained winds of 74 miles per hour ("mph") or higher are expected in a specified coastal area in 24 hours or less.  NOAA issues a Hurricane Watch when there is a possibility that an area could experience hurricane conditions within 36 hours.  http://hurricanes.noaa.gov/.  NOAA advises that the issuance of a hurricane watch should "trigger . . . your . . .disaster plan . . . especially those actions that require extra time, such as securing a boat."

the Vessel's mooring ability at Stuart Harbor was superior to those allowed at the Safe Harbor

Location.  She also believed that the lock to the St. Lucie Canal closed on Thursday night,

blocking her from reaching the Safe Harbor Location, and so she decided to keep the Vessel at

the Stuart Harbor marina.  In actuality, the lock to the St. Lucie Canal did not close to vessel

traffic until 9:30 a.m. on Friday, September 3rd.  Phipps prepared the Vessel for the approaching

Storm.

Specifically she and Oster claim that they secured the Vessel to four mooring dolphins,

each of which had three forty (40) or fifty (50) foot wood-pilings secured together, and to two

additional mooring pilings using approximately twenty (20) separate mooring lines made of

nylon twist and braid, and lines of 1and 1/4 and 1 ½.  Segments of fire hoses were used to

prevent breakage from rubbing.  Phipps and Oster deployed two large anchors at the Vessel's

stern to further secure the *Special Delivery*.  Phipps and Oster employed a diver to ensure the

engine was clear so that it would operate properly if needed, and all loose items on the Vessel

were secured or stored in anticipation of the Storm.

After the first half of the Storm, the Vessel broke loose from its moorings at Stuart

Harbor Marina and began to drift in a northerly direction, eventually coming to a rest at Stuart

Cay's docks.[6]

## Analysis

It is undisputed that this case arises under the admiralty and maritime jurisdiction of this

Court pursuant to 28 U.S.C. §1333.  "Admiralty is a separate body of substantive and procedural

---

[6]  Plaintiff Allied Marine alleges that the Vessel allided with its docks along its path
toward Plaintiff Stuart Cay's docks.  Whether or not this is true is not at issue in either the
Motion or Cross Motion, and remains to be resolved at trial.

law, distinct from the common law." *Schiffahartsgellschaft Leonhardt & Co. v. A. Bottacchi S.A. De Navegacion*, 773 f.2d 1528, 1535 (11th Cir. 1985).  For the most part, the general maritime law "incorporates the general law of torts when not inconsistent with the law of admiralty." *Harrison v. Flota Mercante Grancololmbiana, S.A.*, 577 F. 2d 968, 977 (5th Cir. 1978).   The general maritime law relating to Plaintiffs' negligence claims is well developed and long-established.

It is a well-established principle in admiralty law that a drifting vessel is presumptively liable for damages "unless it can show affirmatively that the drifting was the result of an inevitable accident, or a vis major, which human skill and precaution and a proper display of nautical skill could not have prevented." *The Louisiana*, 70 U.S. at 173, 18 L.Ed. 85.  This principle is called the Louisiana Rule.  This rule

> derives from the common-sense observation that moving vessels do not usually collide with stationary objects unless the moving vessel is mishandled in some way, and from the observation that any evidence of actual negligence, or the lack of it, is likely to be known only to the persons on board, who are in the best position to either keep damaging evidence hidden, or bring favorable evidence forward.

*Bunge Corp., et al. v. Freeport Marine Repair, Inc.*, 240 F.3d 919, 923 (11th Cir. 2001)(internal citations omitted).

Under this rule, "the presumption operates to shift the burden of persuasion onto the moving ship." *Id.*  The burden of proving an inevitable accident or an Act of God rests heavily upon the vessel asserting such defense. *Boudoin v. J. Ray McDermott & Company*, 281 F.2d 81, 88 (5th Cir.1960).  In other words, "[w]hen a moving vessel collides with an anchored vessel or a fixed object, there is a presumption the moving vessel is at fault. *The Oregon*, 158 U.S. 186, 197,

15 S.Ct. 804, 809, 39 L.Ed. 943, 949 (1895); *The Clarita*, 90 U.S. (23 Wall.) 1, 13, 23 L.Ed. 146,

150 (1874); *Patterson Oil Terminals, Inc. v. The Port Covington*, 3 Cir., 1953, 205 F.2d 694,

696; *The Victor*, 5 Cir., 1946, 153 F.2d 200, 202, 203. The presumption suffices to make a prima

facie case of negligence against the moving vessel. *The Victor, supra* at 202.

     The Court first addresses Defendants' assertion that Florida Statute §327.59 changes this

long-standing presumption.  Section 327.59 provides, in pertinent part, that:

> After June 1, 1994, marinas may not adopt, maintain, or enforce policies pertaining to
> evacuation of vessels which require vessels to be removed from marinas following the
> issuance of a hurricane watch or warning, in order to ensure that protecting the lives and
> safety of vessel owners is placed before interests of protecting property.

     Phipps relies upon *Burklow & Associates, Inc. v. Belcher,* 719 So.2d 31 (Fla. 4th D.C.A.

1998) and suggests, that Section 327.59, contrary to the long-standing Louisiana Rule, removes

the presumption of negligence against a moving vessel in situations where a moving vessel

allides with a stationary marina, <u>if</u> the alleged negligence is premised on a failure of the moving

vessel to have removed itself from the marina upon the issuance of a hurricane watch or warning.

Plaintiff's reliance on *Burklow* is misplaced.

      In *Burklow,* the Plaintiff was a marina owner who sued individual boat owners for

damages their boats had allegedly done to the marina because they had failed to move their boats

from the marina.  The suit was brought under a breach of contract theory where the marina owner

alleged that the ship owners had breached their contracts with the marina by failing to move their

boats out of the marina prior to hurricane Opal as required by the marina contracts between the

boat owners and the marina.  The *Burklow* court held that "to the extent that a marina owner's

action for property damage was based solely upon failure of defendant boat owners to move their

vessels from marina after issuance of hurricane watch or warning," the action was barred by

statute.

The Eleventh Circuit has addressed the issue of whether to give effect to a state law to the

exclusion of a conflicting admiralty law and have determined that use of a balancing approach is

best. *See, In Steelmet, Inc. v. Caribe Towing Corp.*, 779 F.2d 1485, 1488 (11th Cir.1986).

Specifically, the balancing approach requires the Court to:

> identify the state law involved and determine whether there is an admiralty
> principle with which the state law conflicts, and, if there is no such admiralty
> principle, consideration must be given to whether such an admiralty rule should be
> fashioned. If none is to be fashioned, the state rule should be followed.... If there
> is a[n] admiralty-state law conflict, the comparative interests must be considered
> -they may be such that admiralty shall prevail ... or if the policy underlying the
> admiralty rule is not strong and the effect on admiralty is minimal, the state law
> may be given effect... .

*Brockington v. Certified Electric, Inc.*, 903 F.2d 1523, 1530 (11th Cir. 1990)(quoting *Steelmet*,

*id.*).

The *Burklow* court determined that Section 327.59 was not preempted by federal

maritime law, because "the issue addressed by the statute, protection of the lives and safety of

persons during the threat of a hurricane, is a matter of paramount local concern to the citizens of

Florida and because the statute des not threaten the uniformity of federal maritime law, which

does not specifically address the issue of evacuation of marinas in the face of a hurricane threat."[7]

Specifically, the court held that "[t]he elements of a maritime negligence cause of action are

---

[7] The Court notes, but makes no determination, that the *Burklow* court may have applied
an incorrect standard in making its determination that, because the defendant boat owners were
under no duty to move their boats, the marina owner could not still have made out a prima facie
case of negligence under the Louisiana Rule.

essentially the same as the elements of common law negligence." *Id.* at 35 (citing *Kermarec v. Compagnie General Transatlantique*, 358 U.S. 625, 79 S. Ct. 406, 3 L.Ed.2d 550 (1959)).

In other words, to make out a *prima facie* case of maritime negligence, a plaintiff must establish that the defendant owed a duty to the plaintiff "under the law to conform to a particular standard of conduct in order to protect others against an unreasonable risk of harm," that the defendant breached such duty, and that the breach harmed plaintiff in a manner that the duty of reasonable care seeks to prevent.  Relying on this statement of maritime negligence, the court held that Section 327.59 removed any duty on the part of a ship owner to move its boat in response to a marina owner's request after the issuance of a hurricane warning, and that accordingly, a negligence claim premised *solely on the breach of the duty to remove a boat*, must fail as there could be no duty to breach.

The statement that "[t]he elements of a maritime negligence cause of action are essentially the same as the elements of common law negligence" is a true statement of maritime general negligence law in the context of personal injury maritime negligence claims.  However, the Court is unaware of any legal precedent prior to *Burklow* which applied the general negligence inquiry of duty, breach and damage to a case of allision where a prima facie case of negligence is presumed.   Such application appears to be illogical as one of the primary reasons for the evolution of the Louisiana Rule, as discussed above, is the common-sense conclusion that a stationary object can not ordinarily be said to have caused a collision with a moving object, and those persons on the moving vessel, being the ones with the best information as to what really happened,  have absolutely no incentive to maintain evidence that would establish that they were negligent.

11

It is important to note, however, that even if the *Burklow* court was correct in using a standard negligence duty/breach analysis as opposed to the Louisiana Rule presumption, the court also recognized that federal admiralty case law "supports the imposition of a duty on a vessel owner to take reasonable care for the protection of another's property, which may, in certain circumstances, include moving the vessel from a marina after an official storm warning has been issued." *Burklow*, 719 S. 2d at 36, n.2 (emphasis added). The court further noted that "during the period *prior to* issuance of any hurricane watch or warning, . . . boat owners owe[] a duty to the marina owner to exercise reasonable care for the protection of marina property, but that duty did not include an obligation to remove their boats upon the request of the marina owner." *Id.*

I find *Burklow* and the few cases which have followed it to be inapplicable to the instant case. Unlike the boat owner's in *Burklow*, who had maritime contracts with the marina owners for dockage of their boats, the Phipps and the *M/V Special Delivery* were not in such privity of contract. They had no relationship prior to the Storm. Additionally, this case does not involve a situation where a marina owner requested a boat owner to move their vessel after the issuance of a hurricane watch or warning. I find the proper approach in this case to be the one utilized under the long-standing Louisiana Rule doctrine, which means that Defendants are presumed to be liable unless they can establish that the allision was an unavoidable accident, or that Hurricane Frances was an "Act of God" of such catastrophic proportion "that human skill and precaution and a proper display of nautical skill could not have prevented." *Bunge Corp. v. Freeport Marine Repair, Inc.,* 240 F.3d 919, 926 (11th Cir. 2001) (after *Burklow*)(citing *The Louisiana,* 70 U.S. at 173.

12

This means two things.  The first is that Defendants' Motion, as it applies to Plaintiff's negligence claims, is due to be denied. The second is that, there being no dispute that Defendants boat allided with Plaintiff's dock, Plaintiff has stated a prima facie case of negligence which places the burden upon the Defendants to establish that the allision was unavoidable.

A party relying on the defense of unavoidable accident bears the heavy burden of establishing that they have "exhaust[ed] every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required.'' *Boudoin v. J. Ray McDermott & Co.,* 281 F.2d 81, 88 (5 Cir., 1960)(quoting L. Hand, J., in *The Hylas*, 1925 A.M.C. 921, 925)." *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co*., 377 F.2d 724 (5th Cir. 1967);[8] *Mount Washington Tanker Co. v. Wahyuen Shipping*, *Inc.*, 833 F. 2d 1541, 1542 (11th Cir. 1987).  Stuart Cay asserts that Defendants' negligence primarily arises due to the fact that they did not move the Vessel in compliance with their previously arranged emergency evacuation plans, despite the fact that they had ample opportunity to do so.   Stuart Cay also claims that the Defendants were negligent in the manner in which they secured the boat for the oncoming storm.

The Eleventh Circuit has held that under the Louisiana Rule, a vessel owner will be held liable for an allision (1) if they had timely and accurate warnings about [an] approaching storm; and (2) they failed to use reasonable means to take proper action to guard against, prevent or mitigate the dangers posed by the hurricane.  *See Boudin*., 281 F.2d at 82.  In other words, "liability, if it exists, must turn on whether the [boat] causing the damage ought ever to have been

---

[8]    In *Bonner v. City of Pritchard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit issued prior to October 1, 1981.

in that predicament." *Id.*  The court determined that courts considering the question of whether a particular ship should have been in their particular predicament must be based upon an evaluation of the ship owner's knowledge and experience.  *Id.*   It is undisputed that Defendants had timely and accurate warnings about the approaching Storm.  The issue to be determined then is whether they used all reasonable means and took proper action to guard against, prevent or mitigate the dangers posed by the hurricane.

  *Boudin* is factually similar to this case.  In *Boudin*, an ocean-going barge tied up to a marina after it's captain had received news of a Hurricane Watch some two days before the storm hit.  The court found that numerous subsequent advisories were issued which provided adequate information to the captain about the size and severity of the storm, and especially about tidal surges, all of which indicated that barge was tied up at an unwise location.  The barge broke loose of her moorings, was lifted and carried by the tide over a mile until it allided with a dock. The court found that the ship master, with his captain's license, had the duty to

> know of the tempestuous forces of wind and tide and seas. He has to make assessments often from confusing or inadequate facts and then translate them into effective decision.  He cannot, therefore, trust to some providential intuition.  He must be informed and experienced in the critical evaluation of data.  Hence, he may not justify an erroneous judgment merely because others not similarly trained or charged with responsibility reached a like conclusion . . . .  He has . . . a special duty to take all reasonable steps consistent with safety to his ship . . . to avoid or minimize the chance of harm to others.

*Boudin*, 281 F.2d at 85.

  The evidence contained in the record establishes the following:

  (1)  Phipps and Oster had notice of the Storm's anticipated approach at or before

     11:00 a.m. on Thursday, September 2, 2004; (Def.'s Dep. 40-45)

(2)    Phipps obtained permission to take the Vessel to its pre-arranged Safe Harbor
location to ride out the Storm prior to Thursday, September 2, 2004; *Id.*

(3)    The Vessel was prepared for departure to its Safe Harbor location on Thursday,
but Phipps believed that, according to storm path projections, the Vessel would be
closer to the projected path of the storm, and decided to wait a bit longer to see
where it was going; *Id.*

(4)    Phipps did not move the Vessel because she and her husband "were told that the
locks were closed . . . [and so they] couldn't get through the locks" to reach their
Safe Harbor; (*Id.*) . . . and because they "had driven over and looked at the place
and weren't sure about the shape of that place, and . . . had been through several
hurricanes in Stuart and it was a nice set up . . . to have the boat suspended against
the dolphins;"

(5)    Phipps knew that the agency responsible for determining when the St. Lucie Lock
would close was the Army Corps of Engineers, and neither she nor her husband
contacted them to ascertain the actual closing time of the St. Lucie Lock; (*Id.*);

(6)    Phipps and her Vessel had been through prior storms at their Stuart Harbor
location, but had never experienced a direct hit from a hurricane, just some "high
winds" perhaps of hurricane strength; (*Id.*)

(7)     the St. Lucie lock did not close until 9:30 a.m. on Friday, September (Aff. of
Michael Shay ¶ 19);

(8)    Phipps and Oster had formerly both held 100-ton Captain's Licenses, and had, in
fact, run passenger charters for hire for almost ten years;

(9)     The Vessel broke free of her mooring as the eastern eye wall of the Storm passed over the Stuart area and was blown into and struck Stuart Cay's marina docks;

(10)    Hurricane Jeanne, a slightly stronger but smaller storm followed virtually the identical path over the area three weeks later;

(11)    The Vessel, which Defendants moved to their Safe Harbor location prior to Jeanne's arrival, sustained no damage and did not break free of its moorings during Hurricane Jeanne;

(12)    Plaintiff's expert, Thomas Danti, determined that Phipps and Oster adequately secured the Vessel prior to the Storm's arrival, and that their decision not to move the Vessel was reasonable because moving the Vessel "would have been futile as the locks and bridges were locked down once the wind reached a constant velocity of 40 mph."  Additionally, there are "few if any facilities that could accommodate a vessel of *Special Delivery's* size."  He opined that, in his opinion, Phipps and Oster "did everything they could to protect their vessel and home from the destructive winds" of the Storm;

(13)    Plaintiff's Expert, J. Michael Shea, opines that Phipps and Oster had "approximately 22 ½ hours to move *Special Delivery* from the Stuart Harbor Marina to its safe harbor inside the St. Lucie Canal before the lock was closed to traffic;" that "a reasonably prudent vessel owner will move their vessel to their safe harbor at the time of a hurricane warning;" and that they were negligent by "failing to timely move the vessel" to their safe harbor where it safely weathered hurricane Jeanne without incident some three weeks later.

16

As stated above, in cases of marine allision where a moving vessel strikes a stationary object, there arises a presumption that the vessel was negligent.  The presumption may be rebutted by establishing, by a preponderance of the evidence, that the vessel was not negligent or that the accident was an unavoidable "Act of God."  I reiterate that a party relying on the defense of unavoidable accident, or the "Act of God" defense, bears the heavy burden of establishing that they have "exhaust[ed] every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required.  In other words, a party relying on the unavoidable accident defense must not have been negligent in making preparations for the storm, and so must still bear the burden of establishing that the accident is not in any way attributable to negligence on that party's part.

So assuming that the Storm was an "Act of God" for which no reasonable preparation could have averted the Vessel's allision with Stuart Cay,[9] the issue to be determined is whether or not Phipps took every reasonable and prudent step within her power to avoid causing harm to others as a result of the impending hurricane.  Looking at each factor, my inclination is that Defendants have failed to meet their burden of establishing that they took every such reasonable and prudent precaution in preparation for the Storm.  It appears to be clear that they had adequate time and opportunity to move their vessel to a safer and more sheltered position, and that such

_____

[9]  Other than the logical determination that all hurricanes are acts of god, I find it unlikely that Hurricane Frances rises to the level of those storms which have previously been seen as "Acts of God" sufficient to excuse a boat owner from traditional liability under the Louisiana Rule.  However, because I must, even in the Act of God context, determine whether the vessel owner took any and all reasonable precautions to avoid damage to others, I assume, without deciding, that Frances was an "Act of God," but note that such issue is currently awaiting determination by the Eleventh Circuit Court of Appeals.  *See David T. Fischer v. S/Y Neraida*, 06-10661-BB (11th Cir.).

decision would have definitely avoided the harm experienced by Stuart Cay.

However, I am mindful that summary judgment is not to be entered lightly, and feel that the conflicting expert testimony as to the prudence of remaining in Stuart Harbor, and as to the adequacy of the securing of the vessel precludes me from finding that there are absolutely no disputed issues of material fact which require further elucidation. Accordingly, I decline to grant Plaintiff's Motion for Summary Judgment at this juncture.

I now turn to Defendants' Motion as it applies to Plaintiff's maritime trespass claim. Unlike the well-developed area of maritime, negligence, there is no distinct claim for maritime trespass under the admiralty substantive body of law. Accordingly, the Court looks to the general common law to ascertain the requirements of a maritime trespass claim. *See Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed. 2d 300 (1982). The Restatement (Second) of Torts provides that:

> One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally,
> (a)     enters land in the possession of another, or causes a thing or a third person to do so, or
> (b)     remains on the land, or
> (c)     fails to remove from the land a thing which he is under a duty to remove.

Restatement 2nd of Torts §158.

Defendants assert that they did not have the requisite intent to enter onto Stuart Cay's property, and so its claim for maritime trespass must fail. However, Defendants neglect to recognize that while their initial entry might be fairly exempt from classification as a trespass, their continued presence after such innocent entry might just as fairly bring a trespass claim into

existence.  There is conflicting evidence as to whether or not the Vessel remained at the

Plaintiff's facility with permission and/or payment, or without.  Accordingly, Defendant's

Motion for Summary Judgment as to Stuart Cay's trespass claim must also be denied.

      In summary, and for the reasons set forth above, it is

      ORDERED and ADJUDGED that the Defendants' Motion for Summary Judgment (DE

330) be and is hereby DENIED.  It is further

      ORDERED and ADJUDGED that the Plaintiff's Motion for Partial Summary Judgment

(DE 338) on the issue of Liability is DENIED.

      DONE and ORDERED this 27th day of March, 2007.

                                            _____

                                          DONALD M. MIDDLEBROOKS
                                          UNITED STATES DISTRICT JUDGE

Copies to all counsel of record.